Filed 5/13/25  In re R.J. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re R.J., a Person Coming Under the Juvenile Court Law. | |
| C.J., <br><br> Petitioner and Appellant, <br><br> v. <br><br> M.L., <br><br> Objector and Respondent. | E084890 <br><br> (Super.Ct.No. ADRI2307228) <br><br> OPINION |

APPEAL from the Superior Court of Riverside County.  Randall Pacheco, Judge. Affirmed.

Law Office of James J. Kenny and Kelly A. Price for Petitioner and Appellant.

No appearance for Objector and Respondent.

1

# I.

## INTRODUCTION

Petitioner and appellant C.J. is the maternal uncle of 10-year-old R.J. Objector and respondent M.L. is the biological father of R.J. C.J. appeals from the trial court's denial of his Freedom from Parental Custody and Control (FPCC) petition pursuant to Family Law code[1] section 7822 as to his nephew R.J.[2] On appeal, C.J. contends the trial court abused its discretion in finding that C.J. failed to meet his burden of proof by clear and convincing evidence to show abandonment under section 7822, subdivision (a)(3), as the finding is not supported by substantial evidence. We affirm.

# II.

## FACTUAL AND PROCEDURAL BACKGROUND

The biological parents of R.J., born November 2014, are father M.L. and mother B.J. M.L. and B.J. had a romantic relationship but were never married. After B.J. became pregnant with R.J., at some point, she informed M.L. of the pregnancy. M.L. is not listed on R.J.'s birth certificate. In October 2014, M.L. learned of federal charges against him. In January 2015, M.L. pleaded guilty to fraudulent wire transfer and defrauding investors in federal court and was sentenced to 108 months in federal prison and ordered to pay $1,303,307 in restitution. M.L. was released from prison in January 2023.

---

[1] All future statutory references are to the Family Code unless otherwise stated.

[2] C.J. had also relied on section 7825 to support his petition. However, that section is not the subject of this appeal.

On November 6, 2023, C.J. filed the FPCC petition pursuant to sections 7822 and 7825, with supporting memorandum of points and authorities, a declaration from C.J., and exhibits.

In December 2023, because C.J. had alleged in his petition M.L.'s criminal record as a reason for seeking termination of M.L.'s parental rights pursuant to section 7825, the probation officer sought the court's permission to obtain M.L.'s California Law Enforcement Telecommunications (CLETS). M.L.'s CLETS record revealed arrests and convictions consisting of possession of stolen property, grand theft auto, disturbing the peace, embezzlement, forging an official seal, altering/forging/falsifying an identification card to commit forgery, carrying a concealed weapon, conspiracy, grand theft, petty theft, providing false information to insurance for payment, and wire fraud from 2009 to 2015.

On December 22, 2023, the trial court appointed counsel to represent M.L.

On January 19, 2024, an evaluator filed a report in regards to the FPCC petition.[3] The evaluator had interviewed C.J., C.J.'s spouse, R.J., and M.L. in preparation of the report. The evaluator reported as follows: C.J. was the maternal uncle of then nine-year-old R.J. Mother B.J. provided sole care for R.J. and would be asking the court to keep her parental rights intact. On September 18, 2023, M.L. filed a petition to establish parental relationship, case No. FLRI2306245.

In December 2023, the evaluator interviewed C.J. at his parents' home where R.J. and B.J. resided. C.J. was married and resided in Chula Vista. Prior to his marriage in

---

[3] The evaluator was a senior probation officer from the Riverside County Probation Department.

3

2018, C.J. lived at his parents' home with his sister B.J. C.J. stated that while he was not present during R.J.'s birth, he lived with and helped rear R.J. until he was four years old. During this time, he viewed himself as a father figure to R.J. and loved "him to death." In 2018, he moved to the San Diego area due to his wife's employment but continued to see B.J. and R.J. regularly "at least every three to four weeks." C.J. described the weekend activities with R.J. when R.J. spent time with him at his home on the weekends, as well as his disciplinary style when R.J. required any corrections or discipline. C.J. expressed that he loves R.J. as if he was his own son and that he was capable of providing financial security for R.J.

C.J. claimed that when M.L. went to prison, M.L. did not reach out to B.J. for several years. However, towards the end of his prison commitment, M.L. spoke to B.J. via telephone a few times and spoke to B.J. and R.J. via Facetime on one occasion. Since being released from custody in December 2022, M.L. had seen R.J. about four times with M.L. initiating the contact and B.J. providing the opportunity to do so. C.J. further reported that when R.J. visited M.L., R.J. was only interested in playing with his half-siblings and never wanted to spend the night with M.L. C.J. did not believe M.L. was a good influence on R.J. due to his criminal behavior, being unremorseful and lack of taking responsibility for his behaviors. C.J. also stated that R.J.'s last contact with M.L. was in June 2023 and that M.L. had not made any financial contributions toward R.J.

The evaluator interviewed M.L. via telephone and claimed that he was open to establishing joint custody of R.J. with B.J. M.L. noted that B.J.'s family disapproved of

4

him and that B.J. was scared to tell her parents of their relationship which resulted in B.J. telling lies about him. M.L. acknowledged being with other women around the same time he was in a relationship with B.J. and having other children. When he first learned B.J. was pregnant, he gave her money to have an abortion and believed she had followed through with it. He discovered that B.J. did not follow through with the abortion until she was about eight months pregnant and that he was never informed of her prenatal visits. M.L. noted that he went to federal prison in February 2015 until January 2023, and that while in prison once he settled down, he reached out to B.J. and R.J. He had established contact with B.J. and R.J. in 2018 or 2019 and used Facetime to talk to R.J. once a week, and at the longest, once every two weeks. M.L. stated that while in prison, any money he had earned he gave to B.J. and that he had given B.J. about $40,000 between 2019 to 2023. After his release from prison, M.L. first lived in a halfway house and then moved in with his father. And since his release, he had assisted with R.J.'s needs as requested by B.J. was also providing care for his three biological children and one of his ex-girlfriend's children. M.L. reported that he had spent time with R.J. when he was allowed, had picked him up from school, and had taken R.J. to his tae-kwon do classes. M.L. claimed that R.J. had asked him why he was not coming to pick him up to visits and B.J. had told R.J. that M.L. was too busy with work. M.L. believed R.J.'s family had been coaching him in what to say or how to respond to him. M.L. last saw R.J. in June 2023 on Father's Day. When he went to go visit R.J. at B.J.'s house, B.J.'s father would not let him in and questioned why he was there via the Ring doorbell. M.L.

explained his purpose, noting he had made plans with B.J. to spend Father's Day with all his children, and waited about 30 minutes outside before B.J. called him to say R.J. was scared and did not want to go with him. Thereafter, all subsequent calls to B.J. went unanswered and due to that, he filed for joint custody as their prior arrangement was not working. M.L. acknowledged his convictions for wire fraud and securities fraud arising from a car theft ring in which vehicles were being sent overseas.

The evaluator interviewed R.J. at his residence where he resided with his mother and maternal grandparents. He was in the third grade and his grandmother took him to school and his mother picked him up after school. R.J. stated that he has a great relationship with his uncle C.J. and that he visits with him every month. When they are together, they play video games and Legos. R.J. was aware of the proceedings and felt "perfectly fine about it because he loves his uncle and will get to spend more time with him." R.J. also reported that he enjoyed spending time with M.L., and that while M.L. was incarcerated, he used Facetime to chat with him "regularly." He reported that he enjoys going to M.L.'s house and playing with his siblings. R.J. felt comfortable and safe around M.L., and that if he never saw M.L. again, "he would feel sad." R.J. wanted to keep seeing M.L.

B.J. was also interviewed at her residence. She noted that she had met M.L. in 2012 and that they had maintained a "'tumultous'" relationship due to M.L.'s polygamous behavior, arguing with her, and having his associates come to her home. When she became pregnant, she told M.L. about it. In April 2014, the doctor told her she

6

had miscarried and told M.L. about it and they had moved on with their lives. In September 2014, she felt her stomach moving and went to see the doctor again and they informed her she was about seven to eight months pregnant. She told M.L., but he never attended any of her appointments leading up to the delivery. She claimed that on the day of the delivery, she told M.L. but instead of coming to the hospital, he asked to borrow money from her. Once she returned home, she asked M.L. if he wanted to see his son, "but he said he did not want to put himself through that because he was going to prison." B.J. stated that once M.L. was sent to prison, about four years went by without any communication from him and that once they started communicating, they communicated by phone "irregularly." During the time he was in prison, M.L. did not provide any financial support for R.J. but instead he asked her for money.

After M.L.'s release, B.J. facilitated visits between M.L. and R.J. with her dropping R.J. off at M.L.'s home and picking him up. The visits were inconsistent and usually for a few hours after school. M.L. wanted R.J. to spend the night at his home but she told him "no." B.J. determined M.L.'s lifestyle was not conducive to R.J.'s well-being as R.J. often spent time playing video games and not having any interactions with M.L. She also believed M.L. treated his other children with attention and favoritism while treating R.J. differently. She claimed that M.L. and R.J. did not have a relationship and believed R.J. liked his time with M.L. as he associated it with "fun time." The last time R.J. saw M.L. was June 2023. R.J. had not mentioned wanting to go to M.L.'s home except on one occasion because he wanted to play video games. She was against R.J.

7

having a relationship with M.L. due to M.L.'s lifestyle not being compatible with R.J.'s upbringing. B.J. also stated that she did not approve of the vulgar language used in M.L.'s home and that M.L. told her if anything ever happened to her, R.J. would never see any of her family again. In contrast, B.J. reported that R.J. had a close relationship with his uncle C.J., that they spoke on the phone daily, and R.J. visited C.J. one weekend a month. She explained that C.J. was like a father figure to R.J., as R.J. grew up with C.J. for his first four years of life. C.J. had developed a "special bond with R[.J.], especially after learning he likely would not be able to have children of his own."

The evaluator concluded as follows: "On November 6, 2023, [C.J.] filed a Petition for Freedom from Parental Custody and Control under Family Code 7822 (no subsection) and 7825 on behalf of [R.J.]. This is not a typical request for termination of parental rights, as [R.J.]'s mother is requesting to have her parental rights remain intact, and [C.J.] will not be living with [R.J.]. [¶] Based on the information provided by all parties, there appear to be various contradictions as to the facts surrounding the pregnancy, [M.L.]'s contact with [R.J.], and financial contributions. Additionally, and although the petition did not allege a specific subsection of 7822 of the Family Code, it does not appear any subsection has been met, as [M.L.] has reportedly not abandoned the child given his filing through the family court for joint custody. Of further concern is the fact a Petition to Establish Parental Relationship was filed prior to this matter by [M.L.] which seems to have prompted the filing of the petition in the instant matter. This suggests [M.L.] is actively making efforts to have a relationship with [R.J.]. Further, the

8

petition also alleged legal cause pursuant to Family Code 7825; however, this code does not appear to have been met when considering [M.L.] reportedly maintained telephonic and/or virtual contact with the child while he was in prison. Considering the aforementioned, the Probation Department is unable to determine an appropriate recommendation on this matter and will solely leave this matter up to the Court's discretion."

Trial on the FPCC petition commenced on October 11, 2024. M.L. and B.J. testified and the evaluator's report and other relevant documents was admitted into evidence. M.L. acknowledged that he had changed his name in order to improve his business investments. M.L. stated that R.J. was his son born in November 2014 and that he and B.J. had a sexual relationship. At some point in the relationship, B.J. became pregnant and explained that at that time, he wanted B.J. to get an abortion due to M.L. going to prison and also not knowing whether he was the father. When he discovered that B.J. was pregnant, he and B.J. were not in a relationship. He believed that B.J. had an abortion and thus did not attend any prenatal appointments. In the later months of the pregnancy, he had contact with B.J. via text messages, and did not know she had the baby until B.J. sent pictures of R.J. to M.L. M.L. stated that B.J. never told him about a miscarriage in April 2014, and gave examples of B.J. telling him lies, such as stating she had cancer or her mother had passed away or M.L. had beaten her up. M.L. saw R.J. after he was born and before he was sent to county jail in February 2015. M.L. and B.J. met at a grocery store and R.J. was in the backseat of B.J.'s car in a car seat. M.L. spoke

9

to B.J. outside of her car and was asking how the baby could be his as he had given her money for an abortion. At that time, M.L. did not accept R.J. was his and had asked B.J. for a paternity test. M.L. denied sending his associates to B.J.'s house to intimidate B.J.

M.L. acknowledged his criminal convictions, including the federal wire fraud charges, and noted he had state and federal concurrent cases and was sent to federal prison in January 2016. M.L. was briefly released in December 2015 from county jail until he was taken into custody in January 2016 by the federal authorities. While in county jail, the federal authorities determined that M.L. was continuing with his fraudulent activities by engaging in 800 phone calls. Once M.L. obtained B.J.'s contact information in 2017 or 2018, M.L. initially made contact with B.J. in 2016 or 2017, but acknowledged that he reported to the evaluator that he made contact in 2018 or 2019. M.L. used someone's cellphone to contact R.J. via FaceTime when R.J. was around three or four years old. They spoke for seven to 15 minutes, sometimes up to 45 minutes to an hour. M.L. would call R.J. on B.J.'s phone number one or two times a week, sometimes more, and never missed birthdays or holidays.

After M.L.'s release to a halfway house in 2022, B.J. no longer answered M.L.'s phone calls or letters and had changed her phone number. M.L. was eventually able to obtain B.J.'s contact number in January 2023 once he was released into the community and spoke with B.J. in February or beginning of March 2023. B.J. apologized to M.L. for not contacting him, noting she was scared her family would find out she had been in contact with M.L. M.L. and B.J. also spoke about reestablishing their romantic

10

relationship. M.L. had contact with R.J. from around February or March 2023 until June 2023. M.L. noted he saw R.J. two to three times a week, that he picked R.J. up from school a couple times, took R.J. to tae-kwon do practice, and saw R.J. at his father's house. M.L. also explained the circumstances surrounding the June 2023 Father's Day incident and B.J. not responding to his calls or texts since June 2023. Thereafter, M.L. filed a joint custody request for R.J. B.J. had not allowed M.L. to have contact with R.J. after June 2023.

M.L. admitted that from the time of R.J.'s birth until the first time he made contact from prison in 2018 was a period of at least one year that he did not make contact with R.J. M.L. explained that he did not have B.J.'s contact number, email address or physical address while incarcerated until 2018 and that his family had helped to obtain B.J.'s contact information. He also acknowledged that at least for one year he did not provide financial support to R.J., noting he did not know R.J. was his. M.L. explained he had given B.J. about $40,000 in financial support between 2019 to 2023 from a family trucking business and that B.J. had been placed on the business's payroll. B.J. received the funds through M.L.'s family or friends via Cash App. The money given to B.J. was money due to M.L. However, M.L. instructed family or friends to give his money to B.J. Since his release from prison, M.L. provided financial support for R.J. M.L. noted that R.J. had a close relationship with two of his half-siblings and that M.L. helped R.J. with his homework. M.L. further explained how R.J. expressed his love for M.L. and noted R.J. had stated to B.J. that he wanted to see M.L. more and that R.J. stated he loves M.L.

B.J. testified that she had met M.L. in 2012 and at some point entered into a romantic relationship with him. In February or March 2014, she became pregnant and informed M.L. of the pregnancy. M.L. did not want the baby and questioned whether he was the father. In April 2014, she was informed that she had miscarried the baby, but in September 2014, she discovered that she was still pregnant. Thereafter, she informed M.L. of the pregnancy, but M.L. did not attend any of the prenatal visits and they were no longer in a relationship. B.J. noted that she informed M.L. that she was in labor, however, he did not come to the hospital even though she told him he was welcome to come. B.J. did not list M.L. as the father on R.J.'s birth certificate. Two weeks after R.J.'s birth, she sent pictures of R.J. to M.L., but M.L. did not respond. They later met at a Target parking lot, and she asked him if he wanted to hold the baby. M.L., however, stated "'I am going away, and I am not going to do that to myself.'"

B.J. explained that she was concerned for her well-being and safety after M.L. was arrested because he had financially taken advantage of her family and was concerned about retaliation. B.J. denied telling her parents that M.L. had assaulted her or changing her phone number from 2014 to 2018. She noted that M.L. had her email address and that she had not changed it and that M.L. was aware of her physical address. When M.L. reinstated communications with her, he did not ask about R.J. B.J. did not deny M.L.'s request to speak with R.J. B.J. denied receiving any financial support from M.L. or through a third-party, such as through his family or friends. B.J. also denied receiving

12

about $40,000 in support from M.L. but noted receiving $60 once in 2020. She also denied being on payroll for M.L.'s family's trucking business.

B.J. claimed that M.L. spoke with R.J. for about 10 minutes "[m]aybe once every two weeks, three weeks" while M.L. was in prison. She denied receiving any email communications from M.L. She also stated that she had reached out to M.L. in 2023 to determine whether a relationship between M.L. and R.J. was possible and that M.L. saw R.J. once every two weeks starting in February 2023 and ending in June 2023 for no more than four hours. R.J. was uncomfortable when he first saw M.L. and did not recognize M.L. She acknowledged that R.J. had a relationship with M.L.'s eldest son and that R.J. enjoyed seeing his older half-brother. B.J. further claimed that R.J. did not want to go with M.L. on Father's Day in June 2023 and said that he was scared and hesitant to visit M.L. In April 2023, a third-party had sent $4,500 to B.J., which she in turn sent to M.L. via the Cash App. B.J. had also sent money to M.L. in case M.L. needed any money during R.J.'s visits with him in April and May 2023. B.J. denied that M.L.'s friends or family tried to obtain her contact information. B.J. thereafter described C.J.'s relationship with R.J., noting they had "an amazing bond" and how C.J. had provided emotional and financial support to R.J.

B.J. agreed that there was a period of at least three years from the time R.J. was born until the time M.L. first made contact with him and the same time period since she received any financial assistance. She denied placing any restrictions on M.L.'s contact with R.J. and acknowledged allowing R.J. to visit M.L. unsupervised. She stopped

13

allowing R.J. to have contact with M.L. in June 2023 because R.J. was becoming uncomfortable visiting M.L. and due to the Father's Day incident. Although B.J. denied wanting to rekindle her romance with M.L., she stated that she "kept him close." She later admitted telling M.L. that she wanted a romantic relationship with M.L. so the three of them could be together, but claimed she was lying when she told M.L. that statement to keep M.L. close and to protect R.J. B.J. also admitted that she had stated M.L. was a good dad, but claimed that it was also a lie to keep M.L. close. B.J. eventually acknowledged that the FPCC petition to terminate M.L.'s parental rights was filed after M.L. filed a request for joint custody of R.J.

Following B.J.'s testimony, as an offer of proof, C.J.'s counsel stated that C.J. would testify about the contacts between R.J. and M.L., the incident about B.J. not telling her parents that she was beaten by M.L., and the financial and emotional support C.J. had provided to R.J. The trial court accepted the offer of proof. The court thereafter inquired about the $4,500 that was sent to B.J. via the Cash App. M.L. showed the court the monthly transaction details on the Cash App. The court thereafter accepted M.L.'s counsel's offer of proof that if M.L.'s father testified, he would state that for either a three-week or three-month period B.J. received monies through the trucking company for which there is no formal record in the amounts of $800 a month for a while and then $300 a month.

The trial court heard closing arguments by the parties on October 21, 2024. After closing arguments, the trial court denied C.J.'s FPCC petition. In regards to section 7822

14

and abandonment, the court first found that "neither party ha[d] any credibility," noting "both parties say whatever they think they need to say to accomplish whatever result they believe is important right now." The court thereafter analyzed the amount of contact, both when M.L. was in prison and when he was released, noting the court could not rely on either party due to their inconsistent statements. The court, however, characterized the amount of contact while M.L. was in prison as "regular," noting that's how R.J. had "characterized them." And once M.L. was released from prison, the court determined that "it was about once a week in the period afterwards." The court explained, ". . . from when [M.L.] contacted [R.J.]'s mom, the ongoing relationship in the manner in which it could be fostered was being fostered with all deliberate speed. It could only be phone calls and FaceTime while he was still in prison. But once he got out, it was time spent unsupervised. Dad, who was presented as Dad and who acted as Dad . . . . [¶] The relationship was being fostered, and it was being fostered . . . with [R.J.]'s mother's consent and, so far as the text messages go back and forth, her desire. And I do believe that all along [M.L.] was asking for as much as he could get; and in particular, once he was out of prison, I do believe he was asking for overnights. They weren't allowed, and, frankly, given that there had been very little contact for a long -- no contact for certain periods of time and only the artificial FaceTime and phone call contact through the entire prison time, when there was contact, even within the context of fostering an ultimate relationship, it was okay, perhaps even advisable, for [B.J.] to be hesitant about overnights until more time had gone by."

15

The court further explained: "The phone calls and FaceTimes went on for a long time. And as soon as [M.L.] got out, in-person contact went on until things went sour. It's [B.J.] . . . who allowed the relationship to reestablish itself. That act obviated the previous periods of abandonment. Just as we can't allow somebody to have periods of noncontact, and as soon as this looks like this might come to a head with the termination of parental rights, to rush in and say, 'Hey, I am doing something now. The previous periods don't matter.' We can't allow somebody to ignore the previous periods, reestablish a relationship, and then say -- and then when things go sour, not say, 'Well, I am going to have to deal with the custody issues on the merits of there being an established -- now an established relationship. I will just relate back to the previous periods of abandonment and say parental rights are terminated anyway.' [¶] I may be wrong, but it seems to me that when the parent, who you could say along with the child, has been abandoned, allows and participates in the rekindling of the relationship, the relationship is rekindled, and now we are talking about a new reality that prevents harking back to the other periods where a petition to terminate parental rights would have been on solid footing. [¶] And in terms of analyzing the burden of proof, it is clear and convincing evidence. And . . . once the responding party presents evidence to rebut the presumption, the burden of proof is fully on the petitioning party. The presumption that the one year of abandonment creates is the presumption effecting the burden of producing evidence. [¶] Once evidence is produced, and the evidence of the phone calls and FaceTime during the period of incarceration and the actual unsupervised visits after

16

incarceration is evidence that challenges the presumption, well, then the full weight of the presumption falls on the petitioner. And I don't think I can say that the phone calls and FaceTime during incarceration and the in-person visits after incarceration were the kind of token contact that don't destroy a finding of environment."

The court found that C.J. had not established the intent to abandon by clear and convincing evidence, noting "allowing a relationship to begin again and fostering it makes it inappropriate to harken back to previous periods of abandonment." The court further stated that the best interest of the child is also a factor to consider and found that it was not in R.J.'s best interest to terminate M.L.'s parental rights. The court noted that R.J. had said he enjoyed his time with his father and brothers and that he would be sad if he could not see his father anymore. The court concluded by stating "[f]or all of these reasons, I just don't believe it's been established by clear and convincing evidence that there is a legally effectual abandonment as of the time of filing this petition, and I don't believe as of the time of filing this petition that it's in the best interest of [R.J.] to terminate [M.L.]'s parental rights."

C.J. timely appealed. M.L. did not file a brief in response.

III.

DISCUSSION

C.J. argues the trial court abused its discretion in finding he failed to meet his burden of proof by clear and convincing evidence to show abandonment under section 7822, subdivision (a)(3), as the finding is not supported by substantial evidence.

17

Specifically, C.J. asserts the court abused its discretion in relying on evidence of artificial communication and support from M.L. during a period of time after the statutory period of abandonment had been established to find the presumption under section 7822, subdivision (b), had been rebutted by M.L.

Section 7800 et seq. governs proceedings to have a child declared free from a parent's custody and control. "The purpose of this part is to serve the welfare and best interest of a child by providing the stability and security of an adoptive home when those conditions are otherwise missing from the child's life." (§ 7800.) To this end, judicial proceedings to declare a child free from parental custody and control are to be determined as expeditiously as possible. (§ 7870, subd. (a).) Moreover, the statutes are to be "liberally construed to serve and protect the interests and welfare of the child." (§ 7801.)

Section 7822 authorizes the termination of parental rights when, inter alia, a child has been left by one parent in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child. (§ 7822, subd. (a)(3).) "'"In order to constitute abandonment there must be *an actual desertion*, accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relation and throw off all obligations growing out of the same."'" (*In re Brittanny H.* (1988) 198 Cal.App.3d 533, 549 (*Brittanny H.*).) Thus, a finding of abandonment is appropriate when three elements are met: (1) the child must have been left with another; (2) without provision for support or without communication from the

18

parent for the statutory period; and (3) with the intent on the part of the parent to abandon the child.  (*Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1010 (*Allison C.*).)  The required one-year period of abandonment need not be the one year immediately preceding the filing of the petition.  (*Adoption of A.B.* (2016) 2 Cal.App.5th 912, 922 (*A.B.*).)

"The failure to communicate or provide financial support for a one-year period is presumptive evidence of an intent to abandon, and 'token efforts' to support or communicate will not overcome the presumption.  (§ 7822, subd. (b).)  However, '[t]he fact that a parent has not communicated with a child . . . or that the parent intended to abandon the child does not become material . . . unless the parent has "left" the child' within the meaning of section 7822."  (*In re H.D.* (2019) 35 Cal.App.5th 42, 50; accord, *In re Amy A.* (2005) 132 Cal.App.4th 63, 68.)

The Legislature has determined the state's interest in the welfare of children justifies the termination of parental rights when the criteria of section 7822 are satisfied.  This is true even though the parent desires to eventually reestablish the parent-child relationship.  In other words, a child's need for a permanent and stable home cannot be postponed for an indefinite period merely because the absent parent may envision renewing contact with the child sometime in the distant future.  Simply stated, a child cannot be abandoned and then put "'on hold'" for a parent's whim to reunite.  (*In re Daniel M.* (1993) 16 Cal.App.4th 878, 883-885 [construing predecessor statutes] (*Daniel M.*).)

19

Findings under section 7822 must be supported by clear and convincing evidence. (§ 7821.) "'Clear and convincing'" evidence requires a finding of high probability. Evidence must be so clear as to leave no substantial doubt and must be sufficiently strong to command unhesitating assent of every reasonable mind. (*In re David C.* (1984) 152 Cal.App.3d 1189, 1208.)

Whether to terminate parental rights lies squarely within the discretion of the trial court and must be based on specific findings of fact. (*A.B.*, *supra*, 2 Cal.App.5th at p. 924.) These findings of fact, including any finding of abandonment, must be supported by clear and convincing evidence. (§ 7821.) On appeal, we will not disturb the decision to terminate parental rights absent an abuse of discretion. (*A.B.*, at p. 924.) The trial court does not abuse its discretion if the order is supported by the appropriate factual findings and the findings are supported by substantial evidence. (*Ibid*.) This includes any finding under section 7822. (*A.B.*, at p. 924; *Allison C.*, *supra*, 164 Cal.App.4th at p. 1010.) We review the record, as a whole, in the light most favorable to the prevailing party, to determine whether substantial evidence supports the trial court's findings. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005, 1011-1012.) The appellant bears the burden of showing the findings are not supported by substantial evidence. (*Allison C.*, at p. 1011.)

Substantial evidence is that which is reasonable, credible, and of solid value such that a reasonable trier of fact could find that termination of parental rights is appropriate based on clear and convincing evidence. Substantial evidence includes circumstantial

evidence and the reasonable inferences flowing therefrom. (*Brittany H.*, *supra*, 198 Cal.App.3d at p. 549.) A reviewing court must accept as true all evidence tending to establish the correctness of the findings of the trial judge. All conflicts in the evidence must be resolved in favor of the respondent and all legitimate and reasonable inferences must be indulged in to uphold the judgment. (*Brittany H.*, at p. 549.)

Abandonment and intent are questions of fact for the trial court. Its decision, when supported by substantial evidence, is binding upon the reviewing court. An appellate court is not empowered to disturb a decree adjudging that a child is or is not an abandoned child if the evidence is legally sufficient to support the finding of fact as to the abandonment. This is true, also, on the question of intent. (*Brittany H.*, *supra*, 198 Cal.App.3d at p. 549.)

Intent to abandon the child must be proved to establish abandonment. (*Daniel M.*, *supra*, 16 Cal.App.4th at p. 885; *In re B.J.B.* (1986) 185 Cal.App.3d 1201, 1212.) "'Intent to abandon, as in other areas, may be found on the basis of an objective measurement of conduct, as opposed to stated desire.' [Citation.] In determining a parent's intent to abandon, the trial court may consider not only the number and frequency of his or her efforts to communicate with the child, but the genuineness of the effort under all the circumstances [citation], as well as the quality of the communication that occurs [citation]." (*In re B.J.B.*, at p. 1212.)

C.J. argues there was clear and convincing evidence giving rise to the presumptive intent to abandon because it was uncontested at trial that M.L. made no attempts to

contact either R.J. or his mother or provided no financial support from the time of R.J.'s birth in 2014 until 2018, even though M.L. knew a child existed between he and R.J.'s mother. C.J. further asserts that the court erred in finding C.J. failed to meet his burden as to the intent to abandon as of the filing of the FPCC petition and that later contact and support by M.L. "obviated" the periods of abandonment. In support, C.J. relies on *Adoption of A.B.*, *supra*, 2 Cal.App.5th 912 and *Daniel M.*, *supra*, 16 Cal.App.4th 878.

In *Adoption of A.B.*, the mother's husband sought to terminate the father's parental rights pursuant to section 7822, subdivision (a)(3), which sets forth a one-year period of abandonment. (*A.B.*, *supra*, 2 Cal.App.5th at pp. 915-916.) The father argued that the trial court erred in granting the petition, contending that the one-year period referred only to the year immediately preceding the filing of the petition to terminate parental rights. (*Id.* at p. 915.) The Court of Appeal concluded that while the statutory period of abandonment must occur prior to the filing of the petition terminating parental rights, there was no limitation requiring the period to occur immediately prior to the termination petition. (*Id.* at p. 919.) "We also reject [the] contention that interpreting the statute to authorize a termination of parental rights where a parent abandoned a child, but subsequently established frequent and constant contact with him or her, would be 'absurd.' In fact, the interpretation [the party] advocates would allow a parent to abandon a child for many years, only to race to the courthouse to obtain visitation as soon as a new stepparent enters the picture, thereby precluding the court from terminating the abandoning parent's rights and interfering with the child's potential adoption, stability

22

and security." (*Id.* at p. 922.) While the appellate court recognized that the father "may not have intended to abandon [the child] permanently and his efforts toward self-improvement were admirable, the law does not require that [the child's] life be kept in limbo based on such circumstances. In fact, doing so would not be consistent with the legislative purpose of providing abandoned children with the stability and security of an adoptive home." (*Id.* at pp. 923-924.) As the *Adoption of A.B.* court indicated, an interpretation of the statute allowing a parent to abandon a child under section 7822 and then later reconnect with the child to negate the abandonment would interfere with the legislative purpose of providing abandoned children with stability and security. (*A.B.*, at pp. 922-924.)

We find *Adoption of A.B.* non-dispositive and the factual circumstances concerning the best interest of the child distinguishable. First, that case does not set out a bright-line rule of the one-year statutory period but rather holds "[t]he plain language of section 7822, subdivision (a)(3), describes abandonment 'for a period of one year,' but does not limit the one-year time period to the period *immediately preceding* the filing of the petition." (*A.B.*, *supra*, 2 Cal.App.5th at p. 919, italics added.) Rather, the period of abandonment is a factor for the court to consider. (*Id.* at p. 922.) The *Adoption of A.B.* court explained, "the Legislature could have reasonably concluded that the existence of parental abandonment for a year or more at any point in a child's life is a factor a court should consider in determining whether terminating parental rights is in the child's best

interests, notwithstanding the parent's more recent attempts to connect with the child."

(*Ibid.*)

Second, here, unlike in *Adoption of A.B.*, the trial court found it was in R.J.'s best interests to not terminate M.L.'s parental rights. The court explained its findings as follows: "And the touchstone of all of this is the best interest of the child, and I don't believe this is a situation where if the abandonment is established by clear and convincing evidence that that in and of itself amounts to making it in the best interest of the child to terminate parental rights. It's a factor to be considered, but the way *A.B.* phrases it is 'Abandonment for a year or more at any point in a child's life is a factor the Court should consider in determining whether terminating parental rights is in the child's interest, notwithstanding the parent's more recent to attempts to connect with the child.' [¶] [R.J.] said that he enjoyed his time with his father. He enjoyed his time with his brothers. One piece of information that both parties agreed to is that all along he had ongoing contact with [R.] -- one of [M.L]'s other sons -- and he said he would be sad if he didn't see his father anymore. So I don't believe it's in his best interest to terminate [M.L.]'s rights."

Substantial evidence in the record support's the trial court's findings that it was not in R.J.'s best interest to terminate M.L.'s parental rights. R.J. clearly stated that he wanted to continue seeing M.L., who had unsupervised visits with R.J. and had provided for his support, as the trial court found. In addition, unlike in *Adoption of A.B.*, here R.J. would continue to live with R.J.'s mother at her parents' residence while C.J. resided in

24

his own home in the San Diego area. Substantial evidence showed that R.J. enjoyed spending time with his father, and that similar with C.J., they would play video games. Although the court found both parents' testimonies incredible, the court found R.J. to be truthful in his statements to the evaluator. Furthermore, unlike in *Adoption of A.B.*, here, the court found that M.L. had regular contact with R.J. both while in prison and once he was released and that M.L. had provided support to R.J. Under the circumstances of this case, we cannot find the trial court abused its discretion in denying C.J.'s FPCC petition.

As previously noted, "the decision to terminate parental rights lies in the first instance within the discretion of the trial court, 'and will not be disturbed on appeal absent an abuse of that discretion.'" (*In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1382.) "When applying the deferential abuse of discretion standard, 'the trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.'" (*In re C.B.* (2010) 190 Cal.App.4th 102, 123.)

In *Daniel M.*, *supra*, 16 Cal.App.4th 878, the father of Daniel acknowledged he had failed to communicate with his son, but claimed any effort to do so would have been futile due to interference from his son's mother. The father also alleged he was unable to visit his son in person because he had become disabled and could not afford to travel from his home in the State of Washington to see his son in Redding, California. (*Id.* at p. 880.) The trial court, construing the predecessor statutes, found by clear and convincing evidence that the father had left his son in the mother's custody for a period

of one year without communication, and the father's claim that the child's mother interfered with his efforts to contact the child were not persuasive. (*Id.* at p. 881.)

Unlike *Daniel M.*, *supra*, 16 Cal.App.4th 878, in the circumstances present here, the trial court determined there was insufficient evidence to support C.J.'s contention that M.L. intended to abandon R.J. The trial court found M.L. had regular contact with R.J. both while he was in prison and once he was released, and "that's how [R.J.] characterized them." The court also found the relationship between R.J. and M.L. was being fostered by R.J.'s mother's consent and that M.L. had unsupervised visits with R.J. In addition, as the trial court noted, unlike here, in *Daniel M.*, the father had not done anything to establish contact until the petition to terminate parental rights was filed. Here, C.J.'s petition was filed in response to M.L. filing a family law petition to seek joint custody of R.J. and M.L. had allowed unsupervised contact with R.J. once M.L. was released from prison. Moreover, even though the court found both parents incredible in their testimonies, the court found M.L. provided some support to R.J. and that M.L. and R.J. were developing a bond with R.J.'s mother's consent. It is not this court's duty to substitute our evaluation of the trial court's credibility findings. (*People v. Barnes* (1986) 42 Cal.3d 284, 303-304.) The trial court fully explained the reasons for its findings, which are supported by substantial evidence.

## IV.

## DISPOSITION

The order denying C.J.'s FPCC petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

McKINSTER

Acting P. J.

FIELDS

J.